**Donald RAGSDALE, Appellant,**

v.

**Winfred OVERHOLSER, Superintendent, St. Elizabeths Hospital, Appellee.**

**No. 15437.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 24, 1960.

Decided June 23, 1960.

Petition for Rehearing En Banc Denied Sept. 19, 1960.

Circuit Judge Bazelon would grant the petition.

12. Cf. Palmer v. United States ex rel. Lane, 1914, 41 App.D.C. 341, 349.

944

Mr. Charles W. Halleck, Washington, D. C. (appointed by the District Court), for appellant.

Mr. Harry T. Alexander, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Mr. Howard Adler, Jr., Washington, D. C., filed a brief on behalf of American Civil Liberties Union, as amicus curiae.

Before Mr. Justice REED, retired,[*] and FAHY and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Appeal at Government expense with court appointed counsel was allowed by order of the District Court to review that court's action dismissing appellant's petition for a writ of habeas corpus. Petitioner has been confined in St. Elizabeths Hospital under D.C.Code 1951 § 24–301 (Supp. VIII 1960).

On September 17, 1957, appellant, charged with robbery, was found not guilty by reason of insanity. The testimony of three eyewitnesses showed appellant and an accomplice had committed a robbery, armed with guns. Appellant's defense was threefold: that he was somewhere else at the time; that he was intoxicated; that he was insane. The evidence that he had a mental disease was sufficient to go to the jury and the District Court submitted the case on both insanity and intoxication. The history of significant mental aberration goes back some years including irrational conduct while serving in the armed forces from 1952 to 1955. A history of irrational violence toward himself and others was shown.[1]

---

[*] Sitting by designation pursuant to Sec. 294 (a), Title 28 U.S.C.

[1.] When on leave from the paratroopers in 1952 appellant was talking with friends when suddenly he ran up two flights of steps counted "1,000, 2,000, 3,000, and boom" jumped to the ground. In 1955 appellant fell asleep on sentry duty and was imprisoned for a year. Following discharge appellant had only one job. He held that job for six months until he got into trouble by breaking a window in October of 1956, was sentenced to sixty days, but said he knew nothing of the occurrence. Following Korea he was arrested for disorderly conduct, of which he has no recollection.

Appellant periodically committed other acts of violence to self and others, which were coupled with or followed by periods of amnesia. On one occasion appellant drank ammonia. On another he jumped out of an automobile being driven at forty miles an hour. Both incidents re-

On November 16, 1958, while allowed ground privileges, appellant fled St. Elizabeths Hospital. A warrant for his arrest as a fugitive issued six weeks later but he was not taken into custody for about 10 months.[2] During this interval the record indicates he worked for several employers without showing abnormal behavior and lived at home with his wife and family.[3] Appellant's own testimony would give some support to belief that he has some insight into his own condition and that he has shown some capacity to adjust himself to normal life.

At the hearing on the petition for a writ of habeas corpus, Dr. William G. Cushard said his diagnosis of appellant as of that time was that he had no mental disorder but that he had "sociopathic personality disturbance, anti-social reaction." He testified that this was his individual professional opinion,[4] which is at odds with the official position of St. Elizabeths Hospital that such a personality disturbance is a mental disease. At appellant's trial in 1957 he testified that appellant was then without mental disease. At the 1959 hearing, in response to a question as to the diagnosis "as of today," he answered: "In my opinion, Your Honor, he still has—this is still the correct diagnosis in his case, and I don't feel that there has been any change in his condition since he was acquitted on the basis of that diagnosis by reason of insanity." Dr. Cushard also testified that no known drugs were effective for treatment of appellant's condition and that "about the only kind of treatment I know for any type of personality [disorder] is to try to change his personality, and that's a very difficult thing to do, to change a person's basic personality." Asked by the court if he thought they were "making some progress" with the patient, Dr. Cushard answered "No * * *"[5] but pointed out that he had not examined appellant on his service for over a year, due to a change in his hospital assignment. This witness conceded that his conclusions were based "in part" on a report of Dr. Platkin, another staff psychiatrist.[6]

Dr. Platkin testified that in September 1957, appellant was suffering from "sociopathic personality disturbance, anti-social reaction" and that his diagnosis was the same in 1957 as at the 1959 habeas corpus hearing. He also said appellant was dangerous to others, in view

---

quired hospitalization, but appellant could give no reason for his bizarre and dangerous acts.

2. No explanation appears in the record concerning this long delay. It is, of course, the absolute duty of the Hospital Superintendent to report an escape as soon as it is known. Similarly, it is the duty of the United States Attorney and the police to apprehend the fugitive at once without undertaking to make any evaluation of whether he is dangerous.

3. In this period he and his wife, also a former inmate of St. Elizabeths Hospital, had a child who was one month old when Ragsdale was apprehended and returned to custody.

4. It was, of course, the individual professional opinion of the witness, not the official views of the hospital staff or the views of the American Psychiatric Association, which Dr. Cushard as a witness was bound to express.

5. Pressed on this point the witness later testified:

"I don't think a person improves or recovers from his personality. This is a type of personality. Many sociopaths, other types, any other type of personality, may adjust for any given length of time. In other words, I think these people are able to control their acts if they make the necessary effort. But that doesn't indicate that his personality is changed."

6. It was Dr. Platkin's report which showed an entry dated August 24, 1959, (ten days before appellant was apprehended) in which he recorded that a woman who said she was appellant's wife called on the telephone and said appellant had threatened her with a knife, that she had left him, that she had called police to ask that appellant be apprehended and returned to the hospital. Dr. Platkin said that he had no way of knowing the caller was in fact Mrs. Ragsdale. Mrs. Barbara Ragsdale, wife of appellant, testified she did not call Dr. Platkin on the phone and that her husband had experienced "no difficulties" while at large and living at home.

of his history of violence. On one occasion in July 1958, when appellant was afforded ground privileges at St. Elizabeths, he departed without leave, returned and engaged in violent acts which led to confinement in the maximum security quarters.

It was against this background of evidence that the District Court dismissed appellant's petition for a writ of habeas corpus and declined release conditionally or otherwise.

Appellant contends (1) that the evidence does not support the District Court's action and (2) that the statute cannot be applied to appellant because it cannot be said he was acquitted "solely by reason of insanity" and (3) that if applicable to him, § 24–301 is an unconstitutional denial of due process because it requires a mandatory commitment without an affirmative finding or judicial determination that the subject is either insane or dangerous.

### 1.

■ We deal first with the contention that the evidence established that appellant was not dangerous or potentially dangerous to himself or others and hence was entitled to relief under his petition. Certain circumstances, if the evidence of appellant was to be believed, suggested that he had been free from symptoms for 10 months. The reports of his employment record and his conduct as described by his wife, are emphasized as showing appellant to be a proper subject for at least conditional release. But the medical evidence is undisputed that appellant is presently suffering from what both experts described as "psychopathic personality disorder," and that he is dangerous.

The mere recital of the evidence demonstrates that the District Court made a permissible choice between expert evidence that appellant was dangerous and other evidence including testimony of laymen tending to suggest he was not. The standards established by this court in Douglas v. United States, 1956, 99

U.S.App.D.C. 232, 239 F.2d 52, as to the relative value of expert and nonexpert evidence of insanity must also govern when the District Court is considering release under § 24–301. See Carter v. United States, 1956, 102 U.S. App.D.C. 227, 252 F.2d 608.

We first dealt with this in Overholser v. Leach, 1958, 103 U.S.App.D.C. 289, 291, 257 F.2d 667, 669, certiorari denied, 1959, 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038, where a unanimous court held that the person seeking release has the "burden of showing that the refusal of the superintendent to issue the statutory certificate was arbitrary or capricious." Perhaps more important in its bearing on the instant case was the court's discussion of the civil commitment procedures, which appellant urges as the only appropriate way he can be held; there we said:

"The test of this statute [§ 24–301] is not whether a particular individual, engaged in the ordinary pursuits of life, is committable to a mental institution under the law governing civil commitments. Cf. Overholser v. Williams, 1958, 102 U.S.App.D.C. 248, 252 F.2d 629. Those laws do not apply here. This statute applies to an exceptional class of people—people who have committed acts forbidden by law, who have obtained verdicts of 'not guilty by reason of insanity,' and who have been committed to a mental institution pursuant to the Code. People in that category are treated by Congress in a different fashion from persons who have somewhat similar mental conditions, but who have not committed offenses or obtained verdicts of not guilty by reason of insanity * * * *There must be freedom from such abnormal mental condition as would make the individual dangerous to himself or the community in the reasonably foreseeable future.* (Footnotes omitted.)" 103 U.S.App.D.C. at pages 291–292, 257 F.2d at pages 669–670. (Emphasis added.)

The purpose of the mandatory confinement provision is disclosed by its language and legislative history. Prior to Durham v. United States, 1954, 94 U.S., App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, commitment was discretionary with the trial judge when a verdict of not guilty by reason of insanity was returned or directed. After the Durham case Congress promptly amended the statute to make commitment mandatory in all such cases. No penal or punitive considerations enter into this procedure. It has two purposes: (1) to protect the public and the subject; (2) to afford a place and a procedure to rehabilitate and restore the subject as to whom the standards of our society and the rules of law do not permit punishment or accountability.

■ It is quite possible, as appellant argues, that a person acquitted and then committed under § 24–301 on a charge calling for a maximum sentence of 18 months may be confined in St. Elizabeths for two, five or ten years—or even beyond that. Nothing less is contemplated by the statute and nothing less will fulfill the protective and rehabilitative purposes of the statute. Compare Greenwood v. United States, 1956, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412.

■ A secondary, but important factor in the application of this statute is the burden and standard of proof. That the burden is on the person seeking release we made plain in Overholser v. Leach, supra. The standard of proof is not expressly defined in the statute and only partially defined in Leach. The primary purpose of the statute—protection for the public and for the subject—suggests at once that the burden on the petitioner was intended by Congress to be heavy. The statute deals in terms of the "foreseeable future" and calls for both a medical evaluation—the certificate—and a judicial evaluation—the finding, before the subject can be released.

Would the standard of a preponderance of the evidence satisfy the purposes and objectives of Congress? We think not. A person so committed has made himself one of "an exceptional class." In a "close" case even where the preponderance of the evidence favors the petitioner, the doubt, if reasonable doubt exists about danger to the public or the patient, cannot be resolved so as to risk danger to the public or the individual. A patient may have improved materially and appear to be a good prospect for restoration as a useful member of society; but if an "abnormal mental condition" renders him potentially dangerous, reasonable medical doubts or reasonable judicial doubts are to be resolved in favor of the public and in favor of the subject's safety. Overholser v. Russell, —— U.S.App.D.C. ——, 283 F.2d 195.

2.

■ Appellant contends that § 24–301 authorizes mandatory commitment only where a defendant is acquitted solely on the ground that he was insane at the time of the commission of the act charged and that on this record we cannot say insanity was the *sole* ground relied on by the jury. He argues that *reasonable doubts* about his sanity rather than an affirmative finding of insanity required the jury to acquit under the charge, citing Tatum v. United States, 1951, 88 U.S. App.D.C. 386, 190 F.2d 612. The verdict rendered was compelled, he says, if the Government failed to prove beyond a reasonable doubt that appellant was sane, even though a *preponderance* of the Government's evidence showed he was sane. It is argued that appellant cannot lawfully be confined in hospital custody absent a post acquittal hearing or trial in which the issue of present insanity is specifically and separately resolved.

While our decision in Orencia v. Overholser, 1947, 82 U.S.App.D.C. 285, 163 F.2d 763, preceded the statutory amendment which made commitment mandatory under § 24–301, that case is controlling on this issue. A reasonable doubt about the sanity of the accused required an acquittal and authorized hospital confinement before the Tatum case as much as after. Tatum did no more than reduce the quantum and quality of

evidence which put mental competence in issue.

### 3.

■ The third ground urged for reversal is that if the procedure by which appellant was confined was in compliance with § 24–301 that statute is unconstitutional since it commands a deprivation of liberty without due process in that it does not afford or require a hearing, trial, or affirmative judicial finding that there is a present mental disease or present danger as a basis for confining him. The constitutional attack must be resolved on whether there is a rational connection between the known evidence as to appellant's mental disease and the statute's mandatory commitment provision. We think that connection is present and that it is rational.

Inherent in a verdict of not guilty by reason of insanity are two important elements, (a) that the defendant did in fact commit the criminal act charged, (b) that there exists some rational basis for belief that the defendant suffered from a mental disease or defect of which the criminal act is a product. Congress did not see fit to provide for a hearing following immediately upon the verdict to determine the defendant's *then* mental condition. Perhaps Congress took into account the inescapable fact that such a hearing would be meaningless until trained medical experts had a reasonable opportunity to observe and examine the subject and report their findings. Hence some time gap between the verdict and the appraisal of the defendant's then existing mental condition is unavoidable under any scheme which would provide adequate safeguards. The problem is whether during that time lapse the defendant should be at large and unattended or whether he should be in a hospital where the observation, examination and medical findings can be completed in the shortest possible time.

■ Would it be reasonable to say that while psychiatrists are trying to determine whether the defendant is or is not dangerous, he should be at large?[7] A premature release without opportunity for the medical appraisal could lead to the commission of new criminal acts. Even a statutory procedure of the kind appellant urges would inevitably require detention for some period of observation and examination. Since the process must develop step by step, and since the person confined under § 24–301 may judicially test the legality of his confinement by habeas corpus,[8] we cannot say that the means selected by Congress violate appellant's constitutional rights. A habeas corpus hearing in this context is a *de novo* proceeding to examine into the petitioner's then existing mental condition; at such hearing he is free to put in evidence, both lay and expert, to demonstrate that he has recoverd to the point where he will not be dangerous to himself or others.

■ The fullness of the hearing which the committed person may invoke at will is emphasized by the fact that while the statute calls for a certificate by the hospital superintendent in the form of a conclusion, this does not mean that the court must accept the naked conclusion of the certificate. Indeed, if the certificate is not supported by medical reports containing recitals which satisfy or persuade the District Judge that the medical conclusion embraced in the certificate is correct, the certificate may be disregarded. If the conclusion embraced in the certificate were to be regarded as binding, Congress would have had no reason to provide for any judicial action following the certificate. This is particularly true with respect to that phase of the certificate which deals with the potential

7. See People v. Dubina, 1943, 304 Mich. 363, 8 N.W.2d 99, certiorari denied 319 U.S. 766, 63 S.Ct. 1331, 87 L.Ed. 1716.

8. See, for example, Tatem v. United States, 1960, 107 U.S.App.D.C. 230, 275 F.2d 894; Lewis v. Overholser, 107 U.S. App.D.C. 83, 274 F.2d 592; Overholser v. Leach, 1958, 103 U.S.App.D.C. 289, 257 F.2d 667; Stewart v. Overholser, 1950, 87 U.S.App.D.C. 402, 186 F.2d 339.

"danger," which is at the heart of the test for retention or release. Plainly the statute calls for a *judicial* determination of eligibility for release, aided—but not controlled—by expert medical testimony.

Since the hospital superintendent's certificate must be supported by *reasons*, either the petitioner or the government may cross-examine the superintendent or other expert witnesses concerning the predicates for the conclusions and opinions which they express concerning the subject's recovery of sanity, and the presence or absence of potential danger in the foreseeable future.

It takes only a slight examination of the practical realities to see why this is so. A petitioner seeking a writ to effect his release from confinement in St. Elizabeths Hospital cannot properly be kept in confinement indefinitely on the bare opinion, conclusion or certificate of the superintendent that petitioner has not recovered and that he will be dangerous if released. The petitioner is entitled to test that conclusion by the familiar processes of adversary proceedings. The corollary, of course, is that the government is similarly entitled to test the medical conclusion that a subject has recovered and that he is not dangerous.

In these circumstances the public interests sought to be protected outweigh appellant's claimed right to be set free the instant a verdict is returned. It is hardly asking too much to require that a defendant who is absolved from punishment by society because of his mental condition at the time of the criminal act should accept some restraint on his liberty by confinement in a hospital for such period as is required to determine whether he has recovered and whether he will be dangerous if released. This is implicit in the idea expressed in Overholser v. Leach that such a defendant is part of an "exceptional class." Not without some significance, although by no means a controlling factor, is the fact

that appellant's assumed mental condition has led him to be held blameless and free from punishment for an act otherwise subject to criminal sanctions.

In Overholser v. Leach, supra, we held that the burden of proof to establish eligibility for release under § 24–301 is on the petitioner. This violates no constitutional guarantee for it has no relationship to the presumption of innocence since neither "guilt" nor "innocence" is involved in this proceeding and the statutory objectives are not punishment but protection and rehabilitation. It has been held, for example, that a state statute which places on the defendant the affirmative burden of proving insanity as a defense does not "violate generally accepted concepts of basic standards of justice." [9] A majority of the courts which have considered the constitutionality of statutory schemes like that of § 24–301 have held that due process is not violated.[10]

The order of the District Court dismissing the petition for a writ of habeas corpus and discharging the writ is

Affirmed.

FAHY, Circuit Judge (concurring).

I concur in affirmance of the order of the District Court in discharging the writ of habeas corpus. Section 24–301, properly construed in the body of law of which it is a part, I think is constitutional, and appellant failed to make a factual showing which entitled him to release. But the opinion of the court goes further than I think is necessary, and I do not entirely agree with it.

I had not considered Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52, to lay down a rule of relative weight of expert and non-expert evidence on the issue of sanity, unless in a very indirect way by reaching a conclusion that the evidence so overwhelmingly pointed to insanity in the particular case as to leave no room for a finding of sanity beyond a reasonable doubt.

---

9. Leland v. State of Oregon, 1952, 343 U.S. 790, 799, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302.

10. See cases collected at 145 A.L.R. 892.

The present opinion refers to Over-holser v. Leach, 103 U.S.App.D.C. 289, 291, 257 F.2d 667, 669, certiorari denied 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038, as holding that the person seeking release has the "burden of showing that the refusal of the superintendent to issue the statutory certificate was arbitrary or capricious." I agree with Leach that the burden is on the person seeking release; but I draw back from holding that the proof must reach the degree of certitude thus attributed to Leach, or required to convict of crime, that is, proof beyond a reasonable doubt, as the present opinion seems also to hold. Since no statute establishes the degree of proof in a case such as this the courts must fashion the rule. I would not transplant into this field a fixed rule which has grown up elsewhere, expressed in terms of "arbitrariness," "capriciousness," or "beyond a reasonable doubt." For the time being, and until the courts have gained greater experience with problems growing out of section 24–301, I would go no further than to say that on the evidence and in the circumstances as a whole the District Court should be able to reach a sound judgment one way or the other on the question of release.

The position of the majority that one committed on a charge calling for a maximum sentence of 18 months may be confined in St. Elizabeths under section 24–301 for perhaps ten years or more, I think needs qualification in aid of the constitutionality of this mandatory commitment section. I agree that there is a rational relationship between mandatory commitment under section 24–301 and an acquittal by reason of insanity. I think it is not undue process of law for society, in seeking a solution of the problem with which the legislation copes, to use such a provision as section 24–301, notwithstanding there is no finding of insanity, but only a doubt with respect to sanity, when section 24–301 comes into operation. See Greenwood v. United States, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412. But this mandatory commitment provision rests upon a supposition, namely, the necessity for treatment of the mental condition which led to the acquittal by reason of insanity. And this necessity for treatment presupposes in turn that treatment will be accorded.

Since an accused is entitled to be acquitted on the ground of insanity although the evidence may merely have led the jury to entertain a reasonable doubt as to his sanity when the offense occurred, the validity of continued confinement under the mandatory commitment provisions of section 24–301 may require that, unless within a reasonable time he progresses toward becoming not dangerous to self or community, the person committed can be held only by a separate civil adjudication of unsoundness of mind, and not solely by reason of section 24–301. It is by no means clear that society can continue to deprive a person of liberty by attributing to a jury's doubt about his mental condition, which led to his acquittal and mandatory commitment, any and all evil or criminal propensities he may be thought to have, and to keep him in confinement because of them. This would transform the hospital into a penitentiary where one could be held indefinitely for no convicted offense, and this even though the offense of which he was previously acquitted because of doubt as to his sanity might not have been one of the more serious felonies.

The availability of habeas corpus in the abstract does not save the statute, especially when it is remembered that in a habeas corpus proceeding the burden of proof necessary to obtain release rests upon the petitioner, whereas it rests upon the committing authorities in civil commitment proceedings. The statute is saved by construing the conditions governing continued confinement consistently with due process. To do this the continued danger to society which warrants continued deprivation of liberty under section 24–301 alone must be, at least, a danger comparable to the seriousness of the offense of which the committed person was acquitted. And if that offense is of a non-violent character a more

lenient approach to the question of danger is in order, particularly in connection with conditional release, as to which see Hough v. United States, 106 U.S.App. D.C. 192, 271 F.2d 458. Moreover, if improvement by treatment does not forecast ability to adjust reasonably well to life in the community, due process may well require, as above indicated, that within a reasonable time, which will vary from case to case, continued confinement be made dependent upon civil commitment proceedings, with their greater procedural safeguards, and not left indefinitely to rest alone upon commitment under section 24–301, which is more summary in nature and therefore does not afford those safeguards.