Harold EIDINOFF, M. D., Petitioner,

v.

Archie M. CONNOLLY, M. D., Superin-
tendent of Rusk State Hospital,
Respondent.

Civ. A. No. 5-383.

United States District Court
N. D. Texas,
Lubbock Division.

Jan. 25, 1968.

Willis Jarrel, Tyler, Tex., for petitioner.

R. L. (Bob) Lattimore, Asst. Atty. Gen., Austin, Tex., Wallace B. Boling, Dist. Atty., El Paso, Tex., for respondent.

OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

On June 11, 1959, Harold Eidinoff was indicted by a grand jury in El Paso County, Texas, for the offense of murder with malice in the shooting death of one Theodore Andress. On Eidinoff's motion for a change of venue the district court in El Paso transferred the case to Lubbock, Texas. Eidinoff filed a motion requesting a pre-trial hearing on the issue of his sanity at the time he committed the shooting.[1] A district court in Lubbock, Texas, impaneled a jury which, after hearing the evidence, returned a verdict of insanity at the time of the act and insanity at the time of the hearing.[2] The jury's verdict of insanity at the time of the act operated as an acquittal of the charge of murder; the verdict of insanity at the time of the hearing required that Eidinoff be committed to a state mental hospital until he became sane.[3] The district court in Lub-

bock committed Eidinoff to the Rusk State Hospital on November 19, 1959. At all times since that date Eidinoff has been confined in the maximum security unit of Rusk Hospital.

On August 28, 1961, Eidinoff filed in the county court of Cherokee County, Texas, a petition for reexamination and for a hearing to determine whether he required continued hospitalization as a mentally ill person. A six-man jury in the county court was unable to reach a verdict and a mistrial was declared.[4] In August 1962, another hearing was held on the 1961 petition. After hearing more than 4 days of testimony, which produced a record of some 560 pages, the jury found that Eidinoff was mentally ill and that he required further hospitalization for his own protection and for the protection of others. Judgment was entered on the jury's verdict on October 18, 1962, and no appeal was taken therefrom.

On October 29, 1962, Eidinoff filed an application for a writ of habeas corpus in the United States District Court for the Eastern District of Texas, alleging that he was sane and not mentally ill and was being illegally confined in the Rusk Hospital. The district court dismissed the application because state remedies had not been exhausted.

On April 24, 1963, Eidinoff filed another writ application in the Eastern District of Texas, restating the allegations of his former petition and further alleging that the state remedies available to him were inadequate to protect his constitutional rights. On June 20, 1963, the district court dismissed the application, finding from the transcript of the Cherokee County proceedings that ample

1. Article 932b, Texas Code of Criminal Procedure (1925), pertinent portions of which are hereafter set forth.

2. The jury assessed Eidinoff's sanity in terms of the M'Naghten, "right-wrong" test as required by Texas statute, Article 34, Vernon's Ann.Texas Penal Code (1925).

3. Article 932b, Texas Code of Criminal Procedure (1925).

4. As enacted in 1957, Article 5547–82(e) provided that the re-examination hearing was to be tried to the county court without a jury. In 1958, the Waco Division of the Texas Court of Civil Appeals held Section (e) unconstitutional in violation of the right to trial by jury. Swinford v. Logue, 313 S.W.2d 547.

evidence existed to support the jury's verdict. The district court also concluded that the Texas procedures available to Eidinoff were an effective means for resolving his mental status.

Upon receiving the order of the district court dismissing his application, Eidinoff sought to file another petition for reexamination and hearing in the county court of Cherokee County. The county judge exercised the discretion accorded him by the Texas Mental Health Code to deny such a petition if filed within two years of judgment entered on a previous petition,[5] and refused to accept the petition for filing.

This action of the county judge was made the basis of another federal writ application filed by Eidinoff in the Eastern District on September 24, 1963. The district court dismissed the application on October 16, 1964, stating that Eidinoff had available in the state courts the writ of mandamus to correct any wrongful action by the county judge.

On July 10, 1964, prior to the entry of the district court's order, Eidinoff filed another petition for reexamination and for a hearing in the county court of Cherokee County. On Eidinoff's application for change of venue, the proceeding was transferred to the county court of Smith County, Texas. In the petition filed in this cause Eidinoff alleged that he was "sane" under the M'Naghten test and therefore entitled to his release. The state's attorney excepted to the allegation of sanity on the ground that "mental illness" was the relevant standard in a reexamination hearing.[6] The county court sustained the objection, whereupon Eidinoff voluntarily dismissed the cause and took a non-suit.[7]

On that same day, and while in custody of the sheriff of Smith County, Eidinoff filed an application for a writ of habeas corpus in the district court of Smith County. For some reason the writ was made returnable by the district court for November 8, 1965, more than a year later. The application was not heard on that day. On December 23, 1965, the state filed a motion to dismiss the application. After a hearing on the motion to dismiss, the district court, on December 30, 1965, entered an order dismissing the writ application.

The dismissal was appealed by Eidinoff to the Texas Court of Civil Appeals, Tyler Division, wherein he prayed that the order of dismissal be reversed and the cause remanded to the district court "to hear the case on the merits and determine whether he is now *sane* and entitled to release."

While awaiting the appeals court to render its decision, Eidinoff filed, on September 17, 1966, another writ of habeas corpus in the Eastern District of Texas. On September 26, the district court dismissed the application because Eidinoff was in the process of pursuing an appeal in the state courts, the determination of which was necessary to satisfy the doctrine of exhaustion of state remedies.

On October 20, 1966, the Court of Civil Appeals dismissed the appeal for want of jurisdiction, stating that the dismissal order was not a final order and was not

---

5. Article 5547–82(g), Vernon's Annotated Civ.Stat., also hereinafter set forth.

6. Article 5547–82 is explicit in its expression that "mental illness" is the standard applicable to proceedings by a mental patient to secure his release.

7. Eidinoff's dismissal of this cause was predicated on a ground which he asserts in this court is of constitutional dimension, namely, that having been committed to a mental hospital as a result of his not knowing the difference between right and wrong, a purely legal test, his release should be conditioned on the same test, and not upon the mental illness test which is wholly a medical standard and which casts upon him a greater burden of proof than the former test. This question will be fully discussed, infra. However, to avoid a confusion of terms in this respect, this court will use "sane", "insane", "sanity" and "insanity" with respect to the M'Naghten or right-wrong legal test and will use "mental illness" with respect to a medically diagnosed thinking disorder.

appealable. Ex parte Eidinoff, Tex.Civ. App.1966, 408 S.W.2d 540, 542. Eidinoff then applied for a writ of error to the the Texas Supreme Court. The high court denied the application "No Reversible Error."[8] Certiorari was denied by the Supreme Court of the United States, Eidinoff v. Kreimeyer, 1967, 386 U.S. 905, 87 S.Ct. 898, 17 L.Ed.2d 801.

The proceeding which led to an application for writ of habeas corpus being filed in the Northern District of Texas was commenced by Eidinoff on August 8, 1966, in the state district court in Lubbock, Texas, from which he had been originally committed.

Apparently pursuant to a 1966 revision of the Texas Code of Criminal Procedure, Eidinoff filed in the Lubbock court an application for a sanity hearing. This procedural revision, Article 46.02, provided that persons committed to a state hospital on a finding of insanity in a criminal proceeding could be released from the hospital on a jury finding of sanity in the committing court, but only after the superintendent of the hospital certified to the trial court that the patient was sane.

Eidinoff's application for a hearing was not accompanied by a certification of sanity by the superintendent of Rusk Hospital and, on August 15, 1966, the district court in Lubbock denied his application for that reason.

It was following this action by the district court in Lubbock that Eidinoff filed the writ application in the Eastern District of Texas on September 17, 1966, which was dismissed while the Smith County habeas corpus case was on appeal, discussed, supra. Following the denial of certiorari in the Smith County case by the Supreme Court of the United States on February 13, 1967, Eidinoff filed the present habeas corpus application in the United States District Court for the Northern District of Texas.

The essence of petitioner's claimed constitutional encroachments relates ultimately to the proposition that he is presently sane and his confinement in the state hospital is violative of the Fourteenth Amendment. The many issues which necessarily precede the substantive determination of Eidinoff's sanity are relative to the procedures to which persons adjudged criminally insane have been given recourse by the State of Texas to secure their release from state mental hospitals. Of these procedures some are challenged as infringing on liberties guaranteed by the Fourteenth Amendment to the Constitution of the United States.

Eidinoff contends that Article 46.02 of the 1966 Code of Criminal Procedure is the exclusive procedure by which he may obtain a jury trial to assess the validity of his continued confinement. He claims that this statute is unconstitutional for the reasons that (1) there is no standard set by which the head of the hospital is to make his determination that a patient is presently sane; (2) there is no procedure provided for hearings to be held by the head of the mental hospital to which he is committed to determine his present sanity; (3) there is no assurance accorded the petitioner that the opinion of the head of the hospital is correct in its conclusion; (4) there is no provision for an inmate to furnish witnesses at a hearing before the head of the hospital; (5) there is no provision for a jury trial to determine the present sanity of petitioner; and (6) there is no provision for an appeal from the decision of the head of the hospital. Petitioner asserts that the superintendents of Rusk Hospital have acted arbitrarily and capriciously in refusing to certify his sanity to the committing court and that due process of law has been denied him by the State of Texas in requiring him to establish that he is not mentally ill and is not a danger to himself and others in order for him to

---

8. In Texas practice the denial of a writ of error "No Reversible Error" or "n.r.e." indicates the Texas Supreme Court agrees with the result reached by the lower appeals court, but does not necessarily agree with the reasoning behind the result.

secure his release when he was committed to the hospital under the "right-wrong" sanity test; he asserts that he must bear a much greater burden under the mental illness standard than he formerly did under the right-wrong standard.

The respondent moved to dismiss Eidinoff's application on the grounds that he has failed to exhaust his state remedies and that this court is without jurisdiction to entertain the matters complained of in the application. The motion to dismiss was overruled and an evidentiary hearing was held.

The course of this lawsuit is determined by the resolution of the issue of whether Article 932b of the 1925 Code or Article 46.02 of the 1966 Code controls the procedure by which petitioner is required to seek his release in the state courts. Eidinoff was committed to Rusk Hospital in 1959 under the provisions of Article 932b. In 1966, this law was superseded by the enactment of Article 46.02. The two statutes differ in prescribing the manner by which a patient adjudged criminally insane is to be released. Article 932b, Section 2, recited that,

"A person committed to a State mental hospital under this Act upon a jury finding of insanity at the time of trial who has been acquitted of the alleged offense is not by reason of that offense a person charged with a criminal offense, and therefore the head of the mental hospital to which he is committed may transfer, furlough and discharge him and shall treat him as any other patient committed for an indefinite period."

Article 46.02, Section 3, sets forth that,

"A person committed to a State mental hospital under this Article upon a jury finding of insanity at the time of trial who has been acquitted of the alleged offense is not by reason of that offense a person charged with a criminal offense. In the event the head of the mental hospital to which he is committed is of the opinion that the person is sane, he shall so notify the court which committed the person to the State mental hospital. Upon receiving such notice, the judge of the committing court shall impanel a jury to determine whether the person is sane or insane. If the jury finds the person is sane, he shall be released. If the jury finds the person is insane, the court shall order his return to the State mental hospital until he is so adjudged to be sane at a subsequent jury trial in such committing county."

The essence of the difference between the 2 statutes is that under 932b the hospital superintendent was vested with the authority to release the criminally insane patient, while under 46.02 the committing court alone is delegated the power to release. Pursuant to Article 932b a criminally insane patient could, apparently, obtain a jury trial in a county court to ascertain whether he required continued hospitalization by initiating a proceeding under Article 5547–82 of the Texas Mental Health Code.[9] The issue

---

9. "Art. 5547–82. Re-examination—hearing—discharge

(a) Any patient, or his next friend on his behalf and with his consent, may petition the county judge of the county in which the patient is hospitalized for re-examination and hearing to determine whether the patient requires continued hospitalization as a mentally ill person.

(b) Upon the filing of the Petition the county judge shall immediately notify the head of the mental hospital in which the patient is hospitalized.

(c) Upon receipt of notice, the head of the hospital shall cause the patient to be examined. If he determines that the patient no longer requires hospitalization as a mentally ill person, the head of the hospital shall immediately discharge the patient. If he determines that the patient requires hospitalization as a mentally ill person, he shall file a Certificate of Medical Examination for Mental Illness with the county court within ten (10) days after the filing of the Petition for Re-examination and Hearing.

(d) At the expiration of the ten-day period, if the head of the hospital has filed a Certificate of Medical Examination for Mental Illness stating that the

is whether Eidinoff, committed under the provisions of Article 932b, has a continuing right, pursuant to that statute, to seek his release through civil proceedings in lieu of the amendment of that statute by 46.02.

■ Eidinoff contends that since January 1, 1966, the date of enactment of Article 46.02, that statute is the *only* means by which he can obtain a jury trial to restore his sanity.[10] He takes the position that 46.02 is an unconstitutional infringement on the right to trial by jury for the reason that a jury trial is conditioned solely on the superintendent's certification that he is sane.

Respondent takes the position that 46.02 is directed only at prescribing the conduct required of the hospital superintendent and does not attempt to delineate the procedure to be initiated by the patient to obtain his release. Respondent contends that 46.02 left undisturbed the right of the criminally insane patient to institute a proceeding pursuant to Article 5547–82 of the Mental Health Code. Alternatively, he expresses that habeas corpus is an adequate remedy for such patient to test the legality of his continued confinement.

While this court is necessarily hesitant to undertake an interpretation of Texas statutes in an area of state law in which little has been written, the question of what remedy, if any, is open to recourse by petitioner is the paramount issue herein upon which constitutional questions of serious concern are contingent.

■ Article 46.02, insofar as it deleted from or contradicted Article 932b, repealed the latter. Article 54.02, Sec. 1, Code of Criminal Procedure (1965). However, 46.02 carried forward that provision of 932b, section 2, which stated that "a person committed to a State mental hospital under this Act upon a jury finding of insanity at the time of the trial who has been acquitted of the alleged offense is not by reason of that offense a person charged with a criminal offense * * *." No repeal of 932b was affected by 46.02 with regard to this provision. Concomitantly, respondent argues that the only change 46.02 made in section 2 of 932b was the obligation on the superintendent when he was of the opinion that the patient adjudged criminally insane had regained his sanity.

Respondent concedes that under 932b a patient adjudged criminally insane had recourse to Article 5547–82 of the Mental Health Code to petition for his discharge and to obtain a hearing on such petition. Although no reported cases address themselves to the propriety of this implied statutory authority in 932b, Eidinoff did pursue this course in the county court of

---

patient requires hospitalization as a mentally ill person, or if the head of the hospital has failed to file a Certificate of Medical Examination for Mental Illness and has not discharged the patient, the county judge shall set a date and place for hearing on the petition and give notice thereof to the patient and the head of the hospital, and shall appoint a physician not on the staff of a mental hospital to examine the patient and file a Certificate of Medical Examination for Mental Illness with the court. The court shall enter the necessary orders to insure that the patient may, if he desires, be examined by a physician of his own choosing at his own expense.

(e) The hearing shall be before the court without a jury. [See Footnote 4, supra.]

(f) If the court finds that the patient does not require continued hospitalization

as a mentally ill person, the court shall order the head of the hospital to discharge the patient. Otherwise, he shall dismiss the Petition.

(g) When the Petition for Re-examination and Hearing is filed before the expiration of one (1) year after the Order of Indefinite Commitment or before the expiration of two (2) years after the filing of a similar Petition, the county judge is not required to order such re-examination and hearing. Acts 1957, 55th Leg., p. 505, ch. 243, § 82."

10. Although Eidinoff may review the legality of his confinement in the state courts by writ of habeas corpus, Ex parte Boehme, 1952, 158 Tex.Cr.R. 278, 255 S.W.2d 206, he is not accorded a jury trial in such a proceeding. Article 11.01 et seq., Texas Code of Criminal Procedure (1965).

Cherokee County to a judgment on the merits of his petition. The county court entertained the lawsuit and no effort was made by the state to oppose the petition on jurisdictional grounds. This court accordingly accepts the proposition that under 932b a patient adjudged criminally insane had recourse to the Mental Health Code to obtain a restoration of sanity hearing.[11]

■ The derivation of statutory authority which granted to the criminally insane patient the recourse of Article 5547–82 necessarily ensued from that portion of 932b, Section 2, which provided that such patients were not persons charged with a criminal offense.[12] The remainder of section 2, permitting the superintendent to furlough or discharge the patient, defines the duties of the superintendent and is not susceptible to an interpretation that it implies the existence of a remedy available to patients.

■ Article 5547–82 is designed to protect state hospital patients from unjustifiable detention. Cf. Swinford v. Logue, Tex.Civ.App.1958, 313 S.W.2d 547. By not classifying the criminally insane patient as a person charged with a criminal offense the Texas legislature has accorded to such an individual this protective remedy.[13]

■ As section 3 of Article 46.02 changed only the duty of the hospital superintendent with regard to his actions when he determined the criminally insane patient had regained his sanity and specifically carried forward from 932b that portion of section 2 characterizing the criminally insane as persons not charged with a criminal offense, recourse to Article 5547–82, which exists by virtue of this latter provision, has not been denied the criminally insane patient by the enactment of Article 46.02. Hence, Eidinoff has available at this time an adequate remedy whereby he may seek the restoration of his sanity and his release.

Because of this holding it will be unnecessary to decide Eidinoff's contention that Article 46.02 is an unconstitutional deprivation of his right to trial by·

---

11. In so concluding this court has given consideration to the opinion in Ex parte Frailey; 1944, 146 Tex.Cr.R. 557, 177 S.W.2d 72. Frailey was indicted for 2 murders. She was found insane at the time of the acts and insane at the time of the trial. Under the provisions of Article 932a, C.C.P., then in effect, she was committed to the Terrell State Hospital in Kaufman County. Under the provision of Article 5561a of the civil statutes, the predecessor of 5547–82 of the present Mental Health Code, she instituted sanity restoration proceedings in the county court of Kaufman County. A jury returned a verdict of "sane" and she was discharged. Immediately upon her discharge she was arrested and held under the original murder indictments. She filed a writ of habeas corpus in the state district court. That court denied her relief and she appealed. On review, the Court of Criminal Appeals observed that under the statute then in effect, 932a a finding of insanity at the time of the act *was not an acquittal of the offense charged* and that Article 5561a specifically applied to only those patients who were not charged with a criminal of-

fense. The court held that only the district court which committed the patient had jurisdiction to order her discharge, she being a person *charged with a criminal offense*, and that the county court proceedings were void.

With the enactment in 1958 of 932b and 5547–82, the Texas legislature significantly changed 932a and 5561a. In 932b it provided that a finding of insanity at the time of commission of the act *was an acquittal* of the offense charged and that a person so acquitted was not charged with a criminal offense. In 5547–82 it deleted the requirement that the patient be a person not charged with· a criminal offense and in 5547–69, the provision governing the application of 5547–82, prescribed that the latter was not applicable to persons adjudged criminally insane and committed under 932a, which persons were, as pointed out in Ex parte Frailey, persons charged with a criminal offense.

12. See footnote 11, supra.

13. See discussion of Ex parte Frailey, 1944, 146 Tex.Cr.R. 557, 177 S.W.2d 72, footnote 11, supra.

jury [14] on the ground that this right is not absolute under that statute but is wholly contingent upon the opinion of the superintendent that he is sane.

■ Petitioner contends that because he was committed to the state hospital upon a finding of insanity he is constitutionally entitled to his release when he regains his sanity and cannot be further detained because he is mentally ill and dangerous to himself and others. Without reaching the question of whether petitioner is sane it is expressed by this court that such a contention lacks merit. In Ragsdale v. Overholser, 1960, 108 U.S. App.D.C. 308, 281 F.2d 943, the court set forth the rationale underlying mandatory commitments upon a finding of criminal insanity:

[The mandatory commitment statute] has two purposes: (1) to protect the public and the subject; (2) to afford a place and a procedure to rehabilitate and restore the subject as to whom the standards of our society and the rules of law do not permit punishment or accountability.

To these ends the State of Texas may lawfully condition the release of its criminally insane patient upon a showing of mental fitness which does not pose a danger to either the patient himself or to the members of the public.

The last of petitioner's contentions which it is necessary to consider is whether he has been receiving treatment which is adequate in the light of present medical knowledge. Rouse v. Cameron, 1967, 125 U.S.App.D.C. 366, 373 F.2d 451.

At Eidinoff's sanity hearing in 1959 in the Lubbock district court, which lasted some 8 days, the jury returned a verdict of insanity at the time of the commission of the act and insanity at the time of the

hearing. The psychiatric evidence upon which the jury rendered its verdict was almost unanimous in its diagnosis that Eidinoff suffered from true paranoia. True paranoia is a relatively, but not extremely, rare mental disorder.[15] It is a psychotic condition [16] in which the patient wrongfully or erroneously interprets an act or occurrence thereby creating a delusion as to such event. This delusion is most commonly manifested in feelings of persecution. The delusion is systemitized so that a logical but erroneous conclusion is arrived at, based on the original false premise. The true paranoia suffers from feelings of inadequacy and in an effort to overcome such inadequacy he develops grandiose ideas or feelings of superiority to others. The paranoia has a need for others to assume his responsibilities. He may be litigious, or prone to engage in lawsuits to assert the validity of the conclusion reached within his structural delusional thinking.

The delusion does not impart itself to areas of the patient's thinking other than that encompassed by the original false premise. The patient is therefore perfectly normal in the other areas of his thinking. However, the structured nature of the delusion is such that anything which is identified with the delusion itself is dealt with by the patient as a part of the delusion.

In relation to the M'Naghten insanity test the patient knows right from wrong and the nature and consequences of his acts in all areas of his thinking with the exception of his structural delusion. As to acts which fall within or relate to the delusion he is unable to distinguish right from wrong and is unable to comprehend the nature and consequences of such acts.

■ Eidinoff is presently diagnosed by Dr. Connolly and members of his staff

14. See, Swinford v. Logue, Tex.Civ.App. 1958, 313 S.W.2d 547, footnote 5, supra.

15. Six psychiatrists testified at the evidentiary hearing before this court. Each of them defined the term "true paranoia". Although some of the doctors differed in their evaluation of the most predominant of the symptoms of true paranoia, they were basically in accord as to the identifiable symptoms of the disorder.

16. A psychotic condition is a mental disorder wherein one's thinking process is out of touch with reality.

as suffering from true paranoia.[17] In arriving at this conclusion Dr. Connolly opinionates that petitioner has the paranoia symptoms of grandiose ideas, litigiousness, the need to have others accept his responsibilities, and he has a structured delusional thinking system. In Dr. Connolly's medical evaluation, petitioner now suffers from the delusions that he is not mentally ill or insane and that a conspiracy exists, fostered by various state officials and influential people, to keep him confined in the state hospital for the remainder of his life as punishment for the crime of which he was acquitted. Eidinoff believes, according to Dr. Connolly, that this conspiracy has exerted such pressure on the hospital superintendent and his predecessors that he will not give his true opinion of Eidinoff's present mental condition, namely, that he is sane, not mentally ill, and entitled to be discharged.

In the light of medical knowledge, as revealed by the psychiatric testimony adduced at the evidentiary hearing, the prognosis for the true paranoia is "poor". As there is no adequate treatment for this disorder, recovery, if achieved in any meaningful degree, is dependent upon the patient's ability, as limited by the severity of the paranoia disorder, to respond to the treatment which is available. One doctor testified that psychoanalysis was the most effective known treatment for paranoia, but that the cost to state institutions of engaging psychoanalysts was prohibitive.[18] The consensus of the staff at Rusk Hospital is that psychotherapy is the most appropriate treatment for paranoia which is available. Elemental in the rehabilitative concept of

psychotherapy relative to true paranoia is that the success of this therapeutic method is dependent upon the degree to which the patient will accept and understand the fact that he suffers from a mental disorder and upon his desire to overcome it. Psychotherapy attempts to impart this understanding to the patient and instill in him the desire to overcome the disorder through psychological rather than medical means.

Two doctors at Rusk Hospital have at different times attempted to engage Eidinoff in psychotherapy. Both were forced to discontinue the program because Eidinoff was unable to accept the fact that he was suffering from a mental disorder.

For a short period of time following discontinuation of the psychotherapy treatments Eidinoff was given group psychotherapy. For 1½ hours a week petitioner was placed in a group of 8 or 9 other patients during which times the patients conversed with one another. Similar to psychotherapy, group-therapy has as its purpose the patient's self-realization of his problems through psychological means and is predicated on the theory that the group members in conversing with one another will act as catalysts or stimuli to the individual member's insight into his respective problem. While Eidinoff's participation in group-therapy endured for a longer period of time than did his psychotherapy treatments, these were also discontinued because of Eidinoff's inability to accept the fact that he suffered from a mental disorder and also, apparently, because of his feelings of superiority over the other patients.

17. This court does not undertake to decide the question of whether Eidinoff is presently mentally ill and in need of further hospitalization. As petitioner has an adequate state remedy to resolve that issue, such is the province of the state courts. For purposes of determining whether Eidinoff is receiving adequate treatment in the light of present medical knowledge, this court will confine its consideration to the type of treatment he is and has been receiving as it relates to the diagnosis of his mental disorder made by the staff of Rusk State Hospital.

18. Psychoanalysis, in its most general definition, is a therapy whereby a patient suffering from abnormal mental reactions comes to recognize his subconscious repression of desires which are the causes of his abnormal reactions.

Group therapy treatments were terminated in the fall of 1965 and Eidinoff went without treatment until June, 1966, when Dr. Connolly, with the assistance of funds from the federal government, established a program of occupational and physical therapy for all patients. Since the inception of this program Eidinoff has been an active participant therein. He authored the physical fitness program adopted by the hospital, participates in the occupational therapy program by engaging in handcrafts, and organized and taught in the hospital's elementary education program for retarded children. He has been commended by the hospital officials for his participation in all phases of this rehabilitative program.

 The occupational and physical therapy programs are calculated to instill within the patient self-pride and responsibility. However ill-adapted such programs may be to cope with the problems of a paranoia disorder, and in particular, Eidinoff's dilemna as diagnosed by Dr. Connolly and his staff, the proposition that petitioner is not receiving adequate treatment cannot be sustained.

Eidinoff's inability to meaningfully engage in psycho- and group-therapy cannot be held against him if his refusal to accept the fact of his mental disorder is in fact a product of that disorder.

In view of the nature of petitioner's inability to respond to psycho- and group-therapy treatments, present medical knowledge affords little more in the method of treatment of true paranoia that Eidinoff is presently receiving. While great medical advances are being made in the field of treatment of the mentally ill, present day efforts cannot be adjudged inadequate by techniques of which only our future generations will be fortunate enough to take advantage.

One other consideration merits discussion. As observed supra, Eidinoff believes that a conspiracy exists against him which has been successful in influencing the present and past superintendents of Rusk Hospital to the prejudice of his rights. At least part of this belief has some basis in fact. It appears that some individuals in El Paso and Lubbock, Texas, have undertaken to influence the successive superintendents of Rusk Hospital to the end that Eidinoff shall remain confined for the rest of his life, but this court is satisfied, on the basis of all the evidence presented on this hearing, that such beseechings have fallen deaf on the ears of physicians dedicated to the integrity of their profession.

Having found that petitioner has available to him an adequate state remedy to test the validity of his continued confinement and further that no rights guaranteed by the Constitution of the United States have been or are being denied petitioner, the application for writ of habeas corpus is in all things

Denied.