In the Matter of ROBERT TORSNEY, Respondent-Appellant. STATE COMMISSIONER OF MENTAL HYGIENE, Respondent; EUGENE GOLD, as District Attorney, Appellant-Respondent.

Second Department, February 5, 1979

282

## APPEARANCES OF COUNSEL

*Eugene Gold, District Attorney (Richard A Finkel, Jay M. Cohen* and *Harold Rosenbaum* of counsel), appellant-respondent *pro se.*

*Rappaport, Matza & Frost* for respondent-appellant.

*Louis J. Lefkowitz, Attorney-General (Alfred B. Annenberg* and *Samuel A. Hirshowitz* of counsel), for respondent.

## OPINION OF THE COURT

*Per Curiam.*

Police Officer Robert Torsney was charged with murder in the second degree in connection with the fatal shooting of 15-year-old Randolph Evans on November 25, 1976. At the murder trial, Torsney adduced medical testimony that at the time of the commission of the crime he was suffering from psychomotor epilepsy—a mental disease. On November 30, 1977 the jury returned a verdict of not guilty by reason of mental disease or defect.[1]

By order of the Supreme Court, Kings County (BARSHAY, J.), dated November 30, 1977, Torsney was committed to the custody of the Commissioner of Mental Hygiene pursuant to the automatic commitment provisions of CPL 330.20 (subd 1). On July 20, 1978 the commissioner, pursuant to CPL 330.20 (subd 2), petitioned the committing court for the release of Torsney from the Creedmoor Psychiatric Center and for his return to the community. Upon the conclusion of a hearing held on the release petition (at which the District Attorney of Kings County fully participated), the court (YOSWEIN, J.) sustained the petition. The District Attorney now appeals from the order which directed that Torsney be released upon the following conditions:

(a) that he not possess or carry a gun;

(b) that he not be a police officer or peace officer; and

(c) that he continue as an outpatient at the Creedmoor Psychiatric Center for a period of five years upon such conditions as may be imposed by the Commissioner of Mental Hygiene or Creedmoor Psychiatric Center, and subject to said commissioner or facility advising the court of a violation of any of the aforesaid conditions.

For the reasons stated hereafter, the order should be reversed and the petition dismissed. Robert Torsney should be

---

1. Section 30.05 of the Penal Law states:

"1. A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity to know or appreciate either:

"(a) The nature and consequence of such conduct; or

"(b) That such conduct was wrong.

"2. In any prosecution for an offense, lack of criminal responsibility by reason of mental disease or defect, as defined in subdivision one of this section, is a defense."

recommitted to the custody of the Commissioner of Mental Hygiene.

The threshold issue is whether the District Attorney has standing to appeal from an order entered in a civil proceeding pursuant to CPL article 330. The second issue is whether the standard for release set forth in CPL 330.20 (subd 3)—i.e., "without danger to himself or others"—was properly construed by Special Term. The third issue is whether the determination of Special Term was supported by the weight of the credible evidence.

CPL 330.20, which deals with the commitment, confinement and release of a defendant acquitted on the ground of mental disease or defect, provides, in pertinent part:

"1. Upon rendition of a verdict of acquittal by reason of mental disease or defect, the court must order the defendant to be committed to the custody of the commissioner of mental hygiene to be placed in an appropriate institution in the state department of mental hygiene * * *

"2. If the commissioner of mental hygiene is of the opinion that a person committed to his custody, pursuant to subdivision one of this section, may be discharged or released on condition without danger to himself or to others, he must make application for the discharge or release of such person in a report to the court by which such person was committed and must transmit a copy of such application and report to the mental health information service of the judicial department in which the court is located and to the district attorney of the county from which the defendant was committed. The court may then appoint up to two qualified psychiatrists * * * to examine such person, to report within sixty days, or such longer period as the court determines to be necessary for the purpose, their opinions as to his mental condition * * *

"3. If the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others, the court must order his discharge, or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it must promptly order a hearing to determine whether such person may safely

be discharged or released. Any such hearing shall be deemed a civil proceeding. After such a hearing, the committed person must be discharged, released on such conditions as the court determines to be necessary, or recommitted to the commissioner of mental hygiene. The commissioner of mental hygiene must make suitable provision for the care and supervision by the department of mental hygiene of persons released conditionally under this section."

## THE STANDING OF THE DISTRICT ATTORNEY

■ As a preliminary matter, the patient challenges the standing of the District Attorney to prosecute this appeal. In *Matter of Lublin v Central Islip Psychiatric Center* (56 AD2d 1, revd on other grounds 43 NY2d 341), this court was in full agreement[2] that the District Attorney was a proper participant in a hearing held pursuant to CPL 330.20. Mr. Justice SHAPIRO stated (pp 17-18): "CPL 330.20 (subd 2) provides for transmittal 'to the district attorney of the county from which the defendant was committed' of the information upon which the Commissioner of Mental Hygiene relies in seeking the discharge of a person committed to his custody, where the commissioner is the petitioner. Implicit in that provision is the right of the District Attorney to appear and call witnesses at the hearing, if he be so inclined".

As this proceeding is denominated a civil proceeding by CPL 330.20 (subd 3), it is governed by the CPLR (see CPLR 101).[3] Pursuant to CPLR 1012 (subd [a], par 1), intervention "shall be permitted * * * in any action when a statute of the state confers an absolute right to intervene". We interpret CPL 330.20 (subd 3) as conferring upon the District Attorney such an absolute right to intervene by the operative notice provisions contained therein (see, also, County Law, § 700, subd 1; cf. *Matter of Miller [Lee]*, 46 AD2d 999; *Matter of Miller*

2. Although Mr. Justice TITONE concurred in part and dissented in part from the majority position, on this issue, he stated (p 18): "I fully agree * * * that the District Attorney was entitled to participate in the judicial proceeding held on the appellant's application for discharge or release (see CPL 330.20, subds 2, 5)." Mr. Justice DAMIANI, who also concurred in part and dissented in part, agreed that the District Attorney had a right to participate.

3. In *People ex rel. Woodbury v Hendrick* (168 App Div 553) the Appellate Division, First Judicial Department, noted that the procedure on the writ of habeas corpus with respect to one in custody as an insane person was not prescribed in the Insanity Law. Accordingly, the court held that the procedure is regulated and governed by the provisions of the Code of Civil Procedure.

*[Sherman]*, 46 AD2d 177). Under this construction, we hold that the District Attorney is a permissible appellant from any appealable judgment or order entered in a proceeding pursuant to CPL 330.20 (see CPLR 5511, 5512).[4]

### THE LEGAL STANDARDS

In his dissenting opinion in *Matter of Lublin v Central Islip Psychiatric Center (supra,* p 20), Mr. Justice TITONE expounded what is now the controlling principle for consideration of the possible release of a detainee who successfully invoked the insanity defense: "[W]here the underlying act was one of extreme violence, reasonable medical doubts and judicial doubts should be resolved in favor of the public * * * and, a fortiori, the burden of proof should devolve upon the detainee to show that he no longer constitutes a danger to himself or others" (see *Matter of Lublin v Central Islip Psychiatric Center,* 43 NY2d 341, 345, *supra).*

In attempting to provide an analytical framework to guide lower courts in the application of this principle, the Court of Appeals in *Lublin* formulated two standards for use in CPL 330.20 proceedings. Firstly, the clear existence of a condition of insanity and dangerousness at the time of the commission of the violent act, as evidenced by the admitted commission of that act, is presumed to continue until the contrary is proven. Secondly, an individual need only show by a fair preponderance of medical evidence that he may be discharged or released without danger to himself or others (see *Matter of Lublin v Central Islip Psychiatric Center, supra,* p 344).

Nowhere in its decision, however, did the Court of Appeals clarify the conclusory terms embodied in CPL 330.20 as a standard for release—"without danger to himself or others". Judge MUROV, who presided over the *Lublin* hearing at the County Court, considered the "very concept of dangerousness * * * [to be] vague and elusive" (85 Misc 2d 48, 53). (See, also, *Matter of Miller [Sherman],* 73 Misc 2d 690; *Lee v Kolb,* 449 F Supp 1368.) In *Lee v Kolb (supra,* p 1381), a three-Judge court found the phrase to be "in and of itself vague and subject to

4. The procedural safeguards of CPL 330.20—to the extent the section requires the Attorney-General to represent the Commissioner of Mental Hygiene where the commissioner supports the patient's claimed right to be free and permits the District Attorney to represent the public's interest in safety—will ensure that proceedings brought thereunder will remain adversarial in nature.

inherent defects in application", and proceeded to enumerate possible constructions of CPL 330.20 which would be reasonable and consistent with its legislative purpose in a constitutional manner. The court there observed (p 1381): "Various courts have construed the term 'danger to himself or others' to mean a propensity to commit criminal acts *(Reynolds v Sheldon* [404 F Supp 1004], *supra,* at 1009), a reasonable foreseeability of danger to a patient or the community *(Rosenfield v Overholser,* 104 U.S. App. D.C. 322, 262 F. 2d 34 [1958]), a high probability of substantial injury *(Cross v Harris, supra,* 135 U.S. App. D.C. [259] at 263, 418 F. 2d [1095] at 1099), and a likelihood of serious harm *(People v McNelly* [83 Misc 2d 262, 267] * * *)" (bracketed matter supplied).

*People v McNelly* (83 Misc 2d 262) upheld the constitutionality of CPL 330.20 under the due process and equal protection clauses of the United States Constitution. The court construed the release standard of CPL 330.20 in terms used in sections 31.37 (now 9.37), 31.39 (now 9.39), 31.43 (now 9.43) and 31.45 (now 9.45) of the Mental Hygiene Law, i.e., "likely to result in serious harm to himself or others", which is further defined as follows (Mental Hygiene Law, § 9.37, subd [a]): "(1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."[5]

■ We agree and hereby construe the standard for release set forth in CPL 330.20 (subds 2, 3)—i.e., "danger to himself or others"—to mean "likely to result in serious physical harm to himself or others" as such term is defined in section 9.37 of the Mental Hygiene Law.[6] We caution the trier of fact not to

---

5. Special Term adopted a different formulation, to wit, "reasonable expectation that such person may * * * engage in behavior that is harmful to himself or others". While we adopt a different test, we intimate no opinion as to the evidentiary distinctions between the two tests.

6. Sections 9.37, 9.39, 9.43 and 9.45 of the Mental Hygiene Law require the detainee to have a mental illness for which some immediate treatment is necessary to fall within their operative emergency or involuntary admissions provisions. Of course, a detainee under CPL 330.20 need not satisfy these criteria for continued confinement. A dangerous detainee will be confined even if not mentally ill or in need of immediate treatment, under CPL 330.20. Conversely, a mentally ill patient may be released if he is proved to be not dangerous.

be circumscribed by the mere conclusions of expert witnesses on the issue of the detainee's danger to himself or others. It should also delve into the validity of the underlying premises upon which such conclusions are based (cf. *Cross v Harris*, 418 F2d 1095, 1100-1101).

## PROCEEDINGS PRELIMINARY TO THE APPLICATION FOR TORSNEY'S RELEASE

The detainee, Robert Torsney, was charged with murder in the second degree in connection with the November 25, 1976 fatal shooting of 15-year-old Randolph Evans. On November 30, 1977 Torsney was found not guilty "by reason of mental disease or defect." Pursuant to CPL 330.20 (subd 1), Torsney was committed to the custody of the Commissioner of Mental Hygiene who placed him in the Mid-Hudson Psychiatric Center on December 2, 1977. On March 3, 1978 Torsney was transferred to the Creedmoor Psychiatric Center (CPC). Sometime in April, 1978 (shortly after Dr. Deborah Kaiser was appointed Chief of Service of CPC's Forensic Unit), Dr. Kaiser, in consultation with the unit's treatment team, recommended to the Director of CPC that Torsney be released. On May 19, 1978 a Special Release Committee was convened to examine Torsney to determine whether he was ready to be discharged. The committee found that Torsney was no longer dangerous to himself or others but was not fit for duty as a (beat) police officer given his temperament, personality, attitudes, etc., i.e., his unconscious racial attitudes and his poor emotional control under stress. Dr. Werner, CPC's director, concurred in and reported the above findings to the commissioner. The commissioner thereupon convened an Independent Review Panel. This panel reviewed the hospital record and agreed with the recommendations of the Special Release Committee.

## THE PETITION AND THE COURT'S ACTIONS THEREON

On July 20, 1978, pursuant to CPL 330.20 (subd 2), the commissioner applied to Special Term for the discharge or release on condition of Torsney. At the request of the District Attorney, Special Term appointed Drs. Milton Hollar and Stanley Portnow, qualified psychiatrists, to examine the petitioner and to report to the court their opinion as to his mental condition. At the further request of Dr. Portnow, the court ordered a psychological test and evaluation of Torsney, which was performed by Dr. Leslie Bowling, a clinical psychol-

ogist. Upon receipt of their reports, the court ordered a hearing pursuant to CPL 330.20 (subd 3).

The patient waived a jury trial and the court proceeded with the hearing, which consumed nine days in the presentation of 18 witnesses.

Testifying for the petitioning Commissioner of Mental Hygiene were Dr. Deborah Kaiser, a clinical psychologist and administrator at CPC, and Gloria Whittington, an administrative nurse. The substance of Dr. Kaiser's testimony was that Torsney was not psychotic, mentally ill, impulsive, hostile, aggressive or racially prejudiced. In short, she believed Torsney to be normal. Thus, she reached the ineluctable conclusion that Torsney was not dangerous to himself or others. Significantly, Dr. Kaiser admitted that she disagreed with all of the diagnoses made of Torsney at Mid-Hudson and CPC. While she diagnosed Torsney as being normal at all relevant times, she confessed that no psychological testing or treatment plan had been initiated for Torsney until after the Special Release Committee recommended Torsney's release. The treatment plan that was finally promulgated for Torsney included no individual treatment and the psychological evaluation was conducted only after Mr. Justice BARSHAY ordered it—more than six months subsequent to Torsney's admission to CPC. In short, she presented no credible basis for her opinions or actions in reference to Torsney. Nurse Whittington was the second and final witness presented by the commissioner. While she too opined that Torsney was not dangerous to himself or others, she acknowledged that she was assigned to the forensic unit nearly eight weeks after Torsney's admission and, more importantly, after the process to release Torsney had been initiated. Her sole contacts with Torsney were occasional greetings in passing. Having presented the patient's hospital records and having called only two witnesses—neither of whom was a psychiatrist—the Attorney-General, on behalf of the commissioner, rested.

The presentation of the patient was equally ineffectual in overcoming the presumption of his continued condition of dangerousness. Testifying for Torsney was Helen Chapman, a mental therapy hygiene aide, and Janine Torsney, the patient's wife. Ms. Chapman testified that she observed Torsney in workshop activities—where he placed plastic forks into

polyethelyne bags—and that he appeared to get along well with other patients at such times. Mrs. Torsney could only express her commendable desire to have her husband return home and her intention to provide a home for him upon his release.

The testimony of the two independent, court-appointed psychiatrists, Drs. Portnow and Hollar—the only experts not in the employ of the Department of Mental Hygiene to testify— must be accorded great weight since they conducted independent examinations of Torsney after completely reviewing his hospital records and trial records. Both psychiatrists independently arrived at the conclusion that although Torsney was not psychotic or mentally diseased, he was suffering, through the entire spectrum of events, from an impulsive and explosive personality disorder reactive to stress. Of all the experts who testified, only Dr. Portnow gave complete consideration to the gravity and quality of the stress Torsney would likely encounter upon release or discharge, e.g., a departmental hearing, financial stress, potential criminal and civil actions based on the alleged violation of Evans' civil rights, continued threats, public exposure, etc. It was Dr. Portnow's opinion that while Torsney might not be dangerous in a confined setting, he might very well react in a dangerous way upon exposure to some of these enumerated stresses. Dr. Portnow concluded that the existence of these stresses, the patient's history of dangerous behavior, the patient's "questionable impulse control and inability to deal with stress," and the need to protect the community, all militated against Torsney's immediate release or discharge to the community. Dr. Portnow recommended that Torsney be released *only* after he completed an eight-week gradual prerelease program and then *only if* he exhibited adequate impulse control and tested out well in a complete psychiatric and psychological examination.[7] As noted, Dr. Hollar also found Torsney to be explosive, volatile, sensitive to stress and impulsive. When questioned as to whether Torsney had the capacity to repeat the dangerous act, Dr. Hollar indicated that "[t]here's nothing in the record or * * * [his] examination that says that under a particular stress it might not happen again." Although in his written report Dr. Hollar recommended that Torsney be released, on cross-examination he explained that this recommendation was

---

7. This gradual prerelease program was also recommended by Grechen Phillips, a CPC psychiatric social worker.

based solely on the fact that there was no psychiatric ground to continue Torsney's confinement, i.e., no mental disease or defect. More importantly, this recommendation was made without considering the stress and living conditions Torsney would face upon release.[8]

Dr. Leslie Bowling, a clinical psychologist, who was appointed by the court to perform a psychological testing and evaluation of Torsney, pursuant to Dr. Portnow's request, was called by the District Attorney. Dr. Bowling testified that Torsney was not mentally defective but that he was "impulsive", "easily stirred" and prone to "boiling over" under stress. He found Torsney to have a capacity for emotional arousal and a diminished objectivity and ability to recognize the limits and constraints of reality when subjected to stress. Dr. Bowling believed Torsney to have the capacity to repeat his behavior of November 25, 1976 and thus recommended that Torsney not be placed in a situation *"of stress and ambiguity"* where objectivity, coolness, emotional control and good judgment were needed. While he did recommend that Torsney be released, this was based on his view that Torsney would not benefit from continued confinement—a consideration not within the purview of CPL 330.20. In reaching his recommendation, Dr. Bowling did not consider whether Torsney would be a danger to himself or the community.

The thrust of the remainder of the District Attorney's presentation was directed at the glaring failure of the State Department of Mental Hygiene, by and through its instrumentalities—Mid-Hudson and CPC—to fully investigate and treat, if necessary, Torsney's condition (diagnosed at his criminal trial to be either psychomotor epilepsy or hysterical neurosis, dissociative state). Dr. M. Vandenbergh, a psychiatrist at Mid-Hudson, testified that Torsney was suffering from an impulsive and explosive personality disorder but was not dangerous.[9] As Dr. Vandenbergh did not believe that Torsney ever

8. Upon the close of the petitioner's presentation and the testimony of the court-appointed experts, the District Attorney inexplicably failed to move for summary judgment. Had such an application been made, Special Term would have been constrained to grant it.

9. Dr. Alan Halpern, a clinical psychologist at Mid-Hudson, made a psychological evaluation of Torsney on December 7, 1977. He too found no organicity or psychosis; but he did find Torsney to be subconsciously racially prejudiced and to have deficient emotional control insofar as minimal stress would result in behavioral impulsivity. Dr. Easwara Bhoothalingom, a psychiatrist at Mid-Hudson, testified that he interviewed Torsney on February 1, 1978 and February 28, 1978 for 15 minutes each time.

suffered from psychomotor epilepsy, no neurological examinations or electroencephalographic tests were ever conducted. Although he believed Torsney should be released, he did not think the court would be amenable to releasing Torsney after only two months of confinement. Accordingly, he did not recommend individual treatment for Torsney or his release. He merely warehoused him.

The District Attorney next sought to exhibit to the court the precarious foundation for the Special Release Committee's recommendation of release. The Special Release Committee consisted of Drs. Sablon Dartigue, Joseph Sklar and John McKnight (who passed away immediately prior to the commencement of these proceedings). Upon Torsney's admission to Creedmoor, Dr. McKnight diagnosed his condition as "hysterical neurosis, dissociative type in remission" and "transient situational disturbance, adjustment reaction of adult life in remission"—conditions marked by inappropriate reactions to stress. The report of the Special Release Committee, written by Dr. McKnight, echoed these findings. It noted that Torsney had poor emotional control under stress, was rigid and impulsive, and continued to suffer from an "adjustment reaction of adult life." The report nevertheless recommended Torsney's release on condition he not serve as a policeman because of his temperament, personality and attitudes.

Upon closer examination, Dr. Dartigue admitted that he never treated Torsney, and was assigned to the forensic unit from May 2, 1978 to July 17, 1978. Significantly, he conceded that Torsney shot Evans because of overhwelming stress and that the committee in determining whether he was dangerous to the community, did not consider whether Torsney would face great stress upon release. Indeed, Dr. Dartigue believed that given the same conditions, Torsney might repeat his behavior of Thanksgiving Day, 1976. Dr. Sklar revealed that he reviewed no records relating to Torsney and was completely unfamiliar with Torsney's background. In fact, Sklar was unfamiliar with the report of the committee with which he concurred. When challenged to explain certain of the committee's findings, he expressly disavowed his concurrence with these findings. He concluded his testimony by expressing

---

On the latter occasion, he informed Torsney that he would be transferred to Creedmoor and not released. He reported that Torsney responded by throwing a temper tantrum like a child. Due to his limited contact with Torsney, Dr. Bhoothalingom refused to proffer a recommendation in regard to Torsney's release or confinement.

his opinion that Torsney should not be hospitalized or placed in a stressful situation. The testimony of these latter two psychiatrists is thus accorded little weight. They appeared to go along with the recommendations of their colleague without seriously questioning the efficacy or underlying premises of his report.

The District Attorney concluded his presentation by calling the three members of the Independent Review Panel—Drs. Stephen Rachlin and A. Louis McGarry and Ms. Rosalind Silver, a social worker. This panel perused portions of Torsney's hospitalization records and jointly conducted a one and one-half hour interview with Torsney. They conducted no independent psychiatric examination of Torsney. The panel members recognized that Torsney's "life after release from the hospital will be chaotic at best." Dr. Rachlin thought Torsney was more susceptible to stress than the average individual but did not find him to be impulsive or to have deficient emotional control. He concluded that the Evans shooting was an isolated incident and that Torsney was fully recovered from whatever it was he had, even if Dr. Rachlin could not in fact specify what the condition was. Dr. McGarry thought Torsney was impulsive with a tendency to boil over but this was inconclusive on the issue of his dangerousness because Torsney was no longer under the stress of being a policeman. Dr. McGarry thought that this change in circumstance was sufficient to prevent Torsney's personality disorder from manifesting itself behaviorally. Ms. Silver agreed with the other panel members' conclusions.

The court also called two final witnesses: Drs. Joseph Siris and Seymour Gandelman. They testified that Torsney's diffusely abnormal EEG did not indicate psychomotor epilepsy. They stressed that such a test could only confirm a clinical finding.

### THE WEIGHT OF THE CREDIBLE EVIDENCE

■ We have carefully weighed and sifted the evidence and hereby determine that the petitioner has failed to sustain his burden of proving he is ready for release upon condition without danger to himself or others. The determination of Special Term should therefore be reversed, the petition denied and Mr. Torsney recommitted to the custody of the Commissioner of Mental Hygiene.

It is clear that Torsney was at least suffering from a

personality disorder which contributed to his actions on November 25, 1976. More importantly, he still suffers from that same condition today. Indeed, the presentation of the petitioner did not rebut the presumption of dangerousness; it only buttressed it. Regrettably the Department of Mental Hygiene never treated Torsney's condition properly or equipped him to deal with his "impulse dyscontrols". The department never administered individual care but only provided Torsney with a "structured environment"—little more than a "warehouse".

We may not shirk our responsibility to the community by prematurely releasing Mr. Torsney while he continues to suffer from a dangerous personality disorder. While "the question of whether or not a person should be released is obviously important, of equal significance is a means of insuring that those retained are receiving proper treatment" (see *Renelli v State Comr. of Mental Hygiene,* 73 Misc 2d 261, 265). Accordingly, the Commissioner of Mental Hygiene should prepare an individual treatment plan for Mr. Torsney forthwith, designed to afford him an opportunity to surmount his dangerous personality disorder and resume his place in the community.[10]

In passing, we note that the statutory formulation of section 30.05 of the Penal Law (see, also, CPL 300.10, subd 3, par [d], 330.10, 330.20) provides for the insanity defense and resultant confinement of those suffering from a "mental disease or defect". The underlying premise of this formulation is that the specialty of psychiatry is in fact competent to determine what mental or personality disorders are appropriate bases for relieving persons of criminal responsibility. Unfortunately, psychiatrists continually redefine their understanding of what a mental disease or defect is. Thus, while the experts were in near unanimity a decade ago that personality disorders were in fact a species of mental defect or disease, today they are in widespread disagreement over this very proposition.

Furthermore, there is an increasing disenchantment with the statutory defense and utilization of not guilty "by reason of mental disease or defect" by perpetrators of crimes. The statute should be amended to keep apace with modern developments in psychiatry and to provide courts and juries with

---

10. Should the commissioner at any time abandon the pursuit of this goal, such a decision would be an appropriate subject for judicial review pursuant to CPLR article 78.

more appropriate guidelines in determining guilt or innocence, as well as more appropriate sentencing and incarceration procedures for those who are guilty of committing serious criminal acts but who are, in fact, suffering from various forms of mental disorders. Courtroom verdicts should not be subject to the vagaries of the experts' disagreement. Indeed, it appears that both the executive and legislative branches are cognizant of this very problem. (See, for example, the Report of the New York State Department of Mental Hygiene to the Governor, entitled The Insanity Defense in New York; see, also, Assembly Bill No. 1782, filed Jan. 23, 1979 by Assemblywoman Elizabeth A. Connelly, and Senate Bill No. 1325, filed on the same date by Senator Joseph R. Pisani, both entitled An Act to Create a Special Commission to Study the Defense of Insanity in Criminal Proceedings.) We intimate no opinion as to the relative merits of the various proposals, but strongly urge that remedial legislation be considered and acted upon expeditiously.

MOLLEN P. J., HOPKINS, TITONE, SUOZZI and GULOTTA, JJ., concur.

Order of the Supreme Court, Kings County, dated December 22, 1978, reversed, on the law and the facts, without costs or disbursements, application for release denied, and Robert Torsney is recommitted to the custody of the Commissioner of Mental Hygiene. The Commissioner of Mental Hygiene is directed to prepare an individual treatment plan for Robert Torsney forthwith. Cross appeal by Robert Torsney dismissed as academic, without costs or disbursements.