Wachtler, J.
(dissenting). The court holds today that a man committed to a psychiatric institution because he shot and killed a young boy should be released despite expert psychiatric testimony that under similar circumstances he would be prone to act again with the same uncontrolled violence. I cannot agree with such a result and therefore dissent. The record offers insufficient proof that the appellant, Robert Torsney, no longer suffers from the very symptoms and personality disorder that precipitated the tragic killing of Randolph Evans. Releasing Torsney at this time would not only deprive him of the opportunity for rehabilitation offered in a psychiatric institution, but would also subject the public to the danger that Torsney might again be overcome by uncontrollably destructive impulses.
Torsney was charged with second degree murder for having fatally shot 15-year-old Randolph Evans on November 25, 1976. A New York City police officer on duty in Brooklyn, Torsney fired his weapon without provocation or justification at point blank range at Evans who was on his way home after walking his grandmother to a bus stop. At trial Torsney admitted having shot Evans, but contended that he was not criminally responsible for his actions when the shooting occur *687 red. On November 30, 1977 a jury found him not guilty by reason of mental disease or defect (Penal Law, § 30.05).
After the trial Torsney was committed to the custody of the Commissioner of the Department of Mental Hygiene (CPL 330.20, subd 1). On July 20, 1978 the commissioner filed a petition in Supreme Court seeking Torsney’s release. Represented by independent counsel, Torsney also participated in the proceeding. After conducting a hearing Special Term ordered that he be released subject to certain conditions. The Appellate Division reversed, finding that Torsney had not sufficiently proven that he was no longer a danger to himself or others.
There are essentially two questions in this case: (1) what must a person committed pursuant to CPL 330.20 (subd 1) prove to secure his release? And (2) did Torsney meet the burden of proof?
The statute which prescribes the standard for release, CPL 330.20 (subd 3), provides: "If the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others, the court must order his discharge, or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it must promptly order a hearing to determine whether such person may safely be discharged or released.”
Although the statute indicates that the critical factor for the court to consider on a petition for release is whether the committed person would pose a "danger to himself or others”, no guidance is provided as to what constitutes a "danger”. Certainly the term is open to various interpretations. In resolving the ambiguity, the Appellate Division construed the term to mean "likely to result in serious physical harm” (66 AD2d 281, 288) which in turn is defined as a "substantial risk of physical harm” (see Mental Hygiene Law, § 9.37, subd [a]). I agree, and the plurality at least seems to agree, that this is a proper and workable definition of dangerousness. However, the plurality would require the discharge of a detainee even though his release would "likely * * * result in serious physical harm to himself or others” if the dangerousness is not causally connected to an identifiable mental disease or defect. In addition the plurality states that to justify confinement of the detainee the mental disease must be treatable. I disagree.
I would hold that the detention of a person committed to a mental institution in accordance with CPL 330.20 (subd 1) *688 should continue unless he proves that he no longer suffers from the symptomatology which made him dangerous.
It is well settled that the person committed pursuant to CPL 330.20 is presumed dangerous until he proves otherwise. As we so recently and unanimously held in Matter of Lublin v Central Islip Psychiatric Center (43 NY2d 341, 344): "Given the clear existence of this condition, as evidenced by the admitted commission of a violent act, it is appropriate that the condition be presumed to continue until the contrary is proven” (emphasis added; People ex rel. Henig v Commissioner of Mental Hygiene, 43 NY2d 334, 340; People v Lally, 19 NY2d 27). Despite this clear pronouncement, the plurality states "that the presumption flowing from an acquittal by reason of mental disease or defect does not presume that a person so acquitted presently suffers from mental disease or defect” (at p 674).
The sole issue confronted in Matter of Lublin v Central Islip Psychiatric Center (43 NY2d 341, 344, supra) and the resolution of that issue was stated as follows: "Must a person who has been validly committed as a result of an acquittal by reason of mental defect or disease, and who at a later time seeks release on the claimed ground that he is no longer dangerous to either himself or others, be required to prove by a fair preponderance of the evidence that he may safely be released? We hold that he must.” A person acquitted of a violent crime by reason of mental disease or defect has unequivocally demonstrated his dangerousness to society if not himself. Although involuntary confinement substantially deprives the committed person of liberty, a fundamental right, the State parens patriae interest in the mentally defective as well as its obligation to ensure public safety require on balance that the burden of proof fall to the detainee (Lublin, supra, at p 345).
There is still the question, however, of what the detainee must prove to secure his release. A resolution to this question depends in part on CPL 330.20 (subds 1, 2) which, in prescribing the standards and procedures for the discharge of detainees, makes no mention whatsoever of any requirement of mental illness to justify continued confinement. The sole consideration, according to the statute, is whether the person "may be discharged * * * without danger to himself or to others” (see McKinney’s 1960 Session Laws of NY, p 2024).
*689 The verdict of not guilty by reason of mental disease or defect presumably resulted from a finding by the jury that the defendant at the time of the wrongful act suffered from symptoms which substantially limited his appreciation of "[t]he nature and consequence of such conduct” or "[t]hat such conduct was wrong” (Penal Law, § 30.05). The purpose for institutionalizing someone acquitted for this reason is twofold: to protect society from the threat that, because of a mental disorder, the detainee might again commit acts of violence (People v Lally, 19 NY2d 27, 33, supra), and to rehabilitate him so that he may be released into society without the risk of further harm. Should the symptoms of the mental disorder disappear both justifications for continued confinement disappear as well. No longer is the detainee, because of a mental disorder, a threat to the safety of himself or others. Nor once the symptoms have finally been remitted, is he in need of rehabilitation. Detention beyond this point would constitute punishment which is impermissible since the confined person was acquitted by the jury and found not to have been responsible for his actions when the wrongful act was committed. It is therefore logical that to secure his release the detainee should have to prove that he no longer suffers from the symptomatology associated with the wrongful act (Insanity Defense in New York: A Report to Governor Hugh L. Carey, New York State Department of Mental Hygiene, at p 50).
But I cannot agree with the plurality that a dangerous detainee must be released if he does not suffer from a "mental disease or defect” which fits into a psychiatric category and has a particular psychiatric label. Over the years the definition of mental illness has shifted according to the prevailing doctrine of psychological thought. In addition, there is often a lack of agreement among psychiatrists as to whether a given mode of unusual or deviant behavior constitutes a "mental illness” at all. We would therefore be unwise to bind our legal determinations to psychiatric theories which are not only undergoing constant re-examination and modification, but which are designed to deal with medical rather than legal problems. Our primary concern must be to protect the public from those who, for psychological reasons, have caused and are likely in the future to cause serious harm to others. To release such a person merely because his symptoms elude classification is indefensible. The issue must be resolved, not by the rigid application of psychiatric categories of mental *690 illness, but rather by reasoned judgment based on careful scrutiny of the record.
Indeed by the very language of section 30.05 of the Penal Law the "mental disease or defect” defense embraces "mental defects”, a term of far broader reach than the less flexible standard of "mental disease”. It is quite possible that a jury could acquit a defendant by reason of a "mental disease or defect” when the defect was evidenced by symptoms not easily labeled as a "disease” listed in a psychiatric lexicon. Yet in the judgment of the jury the symptomatology might have prevented the defendant from appreciating the consequences of his conduct, thereby justifying application of the "mental disease or defect” defense. It would be a frightful paradox to release a detainee still manifesting the same symptoms because his mental defect could not be labeled in psychiatric terms — even though the jury might well have predicated its acquittal exclusively on the symptoms. By its holding today the plurality exalts this paradox to law.
To accomplish this dubious result, the plurality contends that it is following the constitutional mandate to afford detainees equal protection of the laws. Because a person cannot be civilly committed unless he is "mentally ill”, the plurality holds that a person who has been acquitted of a killing by reason of mental disease or defect must be released unless he too is "mentally ill”, despite the absence of any such requirement in CPL 330.20. The equation fails because there is a critical distinction between the two classes; the person acquitted of a violent crime by reason of mental defect has necessarily demonstrated by his own hand that he is a menace to society, whereas the person sought to be civilly committed has not. The State may not ignore the greater threat posed by the acquitted person. The compelling State interest to shield the public from this threat justifies that the two classes be dealt with somewhat differently (cf. People ex rel. Wayburn v Schupf, 39 NY2d 682; Matter of Richard E. R., 52 AD2d 927). Indeed the plurality itself recognizes that "the unique status of persons acquitted of a crime by reason of mental disease or defect permits the State to treat this 'exceptional class’ somewhat differently from other individuals believed suffering from mental disease or defect” (at p 673).
Nor can I agree with the plurality’s position that institutionalization may not continue if the mental defect is untreatable. Surely if a person acquitted of a violent crime by reason *691 of a mental defect is compulsively homicidal because of a psychiatric disorder, the fact that the disorder is untreatable does not justify the person’s release and return to society.
Before turning to the hearing record on the application for release, it is instructive to review briefly reports of the psychiatrists and psychologists presented at the murder trial. Dr. Herbert Spiegel concluded that Torsney is "prone to hysterical dissociation under stress”, and Dr. Florence Shumer found Torsney to be "volatile” and "impulsive”. According to Dr. Daniel Schwartz, Torsney was suffering from psychomotor epilepsy. Dr. Joy Roy’s examination of Torsney revealed that "[w]hen he feels attacked and threatened the aggression escapes the censor and may erupt in impulsive behavior.” When this trial evidence is compared to the testimony presented at the hearing, it becomes all too apparent that Torsney’s condition has never changed substantially and that he remains as dangerous today as he was on the day he shot Randolph Evans.
At the hearing Dr. Stanley Portnow, one of the two independent court-appointed psychiatrists, noted that Torsney was not suffering from a classical form of psychosis or neurosis but rather labeled Torsney’s condition a "personality disorder”. Dr. Portnow further stated: "My diagnosis would have been constant throughout the entire spectrum of events and that diagnosis would read 'impulsive or explosive personality’ ”. "Stress”, according to Dr. Portnow, "is frequently the trigger by which the impulsive personality fires off”. He also expressed his belief that Torsney should face stress in small quantities to be reasonably sure that another catastrophe would not occur. Explaining why he recommended a gradual release procedure the doctor said: "I attempted to protect both Mr. Torsney and the community by recommending a prerelease procedure to minimize the severity of the stress upon this impulsive personality which already, on one occasion, has exploded, the result having been a catastrophe.” The other court-appointed psychiatrist, Dr. Milton Hollar, agreed that Torsney is "impulsive”, "volatile” and "explosive”. Dr. Hollar also feared that under stressful circumstances Torsney might erupt again. Nevertheless the doctor recommended Torsney’s release because as a nonpsychotic patient, Torsney’s institutionalization was not medically warranted.
During the period that Torsney was detained in the Mid-Hudson Psychiatric Center his principal therapist was Dr. *692 Mark Vandenbergh who conducted five to eight sessions with Torsney of about one hour each. Dr. Vandenbergh stated that Torsney was susceptible to hysterical dissociative reactions under stress. It was such a reaction that precipitated the slaying of Evans, and according to Dr. Vandenbergh a violent explosion could occur again under similar circumstances. In view of these findings, Dr. Vandenbergh’s conclusion that Torsney was neither mentally ill nor in need of treatment are of little moment. Likewise, Dr. Alan Halpern, a staff psychologist at Mid-Hudson who examined Torsney only once, found some evidence of a neurotic character disorder — an hysterical personality. Dr. Halpern also observed that Torsney consistently seemed to lose his emotional control when faced with emotionally laden test situations. The only other therapist at the Mid-Hudson facility to examine Torsney was Dr. Easwara Bhoothalingom, the Forensic Unit Chief. Although he, too, examined Torsney but once, he nevertheless confirmed the familiar diagnosis of "hysterical reaction dissociative type”. It is noteworthy too that Dr. Bhoothalingom conceded that no special treatment had been administered to Torsney at Mid-Hudson.
Dr. Leslie Bowling, a staff psychologist at Creedmoor Psychiatric Center, was appointed by the court to administer a battery of psychiatric tests to Torsney, who had not previously been tested at Creedmoor, although he had already been there for six months. When asked if Torsney, because of his impulsive personality, had the capacity to act the same way as he had acted on the day of the killing, Dr. Bowling answered "yes”, but added that there was no way to be certain. Nevertheless because he deemed Torsney’s condition untreatable, Dr. Bowling recommended release despite the apparent danger.
Insofar as the findings of the special release committee, comprised of Drs. Sablón Dartigue, Joseph Sklar and John McKnight, are concerned, it is clear that only Dr. McKnight had had any significant contact with the patient. Indeed Dr. Sklar admitted that he was completely unfamiliar with Torsney’s background. Dr. McKnight diagnosed Torsney’s condition as "hysterical neurosis dissociative type in remission”, marked by inappropriate reaction to stress. Yet he recommended that Torsney be released on condition that he not be a policeman. Similarly the independent review panel at Creed-moor conducted no independent psychological evaluation of *693 Torsney, but instead based its recommendation on a perusal of Torsney’s hospital records and an hour and a half interview. Interestingly, Dr. Louis McGarry, a member of the panel, stated that Torsney’s personality disorder was treatable, but that the patient was not receptive to treatment.
It is most important to remember that in analyzing this testimony, the trier of the facts need not accept the ultimate conclusions of expert witnesses regarding a patient’s dangerousness or the propriety of his continued confinement, for the underlying facts as attested to by the witnesses may support contrary conclusions (cf. Cross v Harris, 418 F2d 1095, 1100-1101). Hence although several psychiatrists testified that Torsney should be released, I would agree with the view expressed by the Appellate Division that their testimony strongly indicates the need for his further confinement.
The hearing testimony overwhelmingly demonstrates that Torsney has remained as volatile and explosive as he was on the date of the killing. The evidence shows that his explosiveness is a manifestation of a personality disorder as an hysterical dissociative reaction, the same diagnosis offered by Dr. Spiegel at the murder trial. According to these experts it was this disorder that impelled Torsney to kill Randolph Evans, and according to the same experts it is this disorder that could drive Torsney to commit a similar act of violence in the future. Clearly Torsney’s condition has not changed. Indeed he has not received individualized treatment at either Mid-Hudson or Creedmoor.
The plurality is concerned that we not " 'transform the hospital into a penitentiary where one could be held indefinitely’ ” (at p 677, quoting Ragsdale v Overholser, 281 F2d 943, 949-950). I agree, of course, that hospital confinement should never be abused to deprive someone of his liberty unfairly. However, when a person, driven by an explosive personality disorder, has proven by an act of senseless violence that he is a menace to others, so long as the psychological condition persists it is our obligation to protect the public from further acts of violence that he may commit.
Accordingly, I would affirm the order of the Appellate Division.
Judges Jones and Fuchsberg concur with Judge Jasen; Judge Meyer concurs in a separate opinion in which Judge Fuchsberg also concurs in the following memorandum: Since *694 I see no inconsistency between the views expressed by Judge Jasen in the plurality opinion and those by Judge Meyer in his concurrence, I join in both; Judge Wachtler dissents and votes to affirm in another opinion in which Chief Judge Cooke and Judge Gabrielli concur.
Order reversed, etc.